IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| IN THE MATTER OF THE SEARCH OF<br><br>APPLE IPHONE 14 PLUS, YELLOW IN COLOR, PHONE NUMBER: 502-780-9376, SERIAL NUMBER: K4YYYGPRWG, IMEI NUMBER: 358257933196499.<br><br>--CURRENTLY LOCATED AT LEXINGTON POLICE DEPARTMENT LOCATED AT 150 EAST MAIN STREET IN LEXINGTON, KENTUCKY 40507. | Case No. 5:24-MJ-5173-MAS |
|---|---|

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

1. I, Christopher D. Faas, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—three electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3. I am a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been since October of 2020. As such, I am a federal law enforcement officer authorized to investigate violations of federal law and to apply for and execute warrants issued under the authority of the United States. I investigate various federal crimes, including those involving child pornography and child exploitation. Prior to joining the FBI as a TFO, I was

assigned in December of 2018 to the Criminal Investigations Section of the Georgetown Police Department ("GPD") as a Detective, where I also currently serve. Within this assignment, I am additionally a task force affiliate of the Kentucky Internet Crimes Against Children Task Force, which is headed by the Kentucky State Police, and made up of several local affiliate agencies. Prior to my assignment as a Detective with GPD, I was assigned to the Patrol Section of the GPD since January of 2018. Prior to this assignment, I worked and began my career in law enforcement with the Nicholasville Police Department. I began this employment as a sworn police officer in September of 2014, where I worked in the Patrol Section until leaving the Nicholasville Police Department and laterally transferring to the Georgetown Police Department. I have extensive law enforcement training in child exploitation crimes. Most of my caseload consists of child exploitation crimes involving the Internet and computer equipment. I have attended numerous in-services and training courses, and I have completed online training in relation to computer crimes against children and computer crimes in general.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all knowledge about this matter. I have set forth only the facts that I believe are necessary for the limited purpose of establishing probable cause to conduct a search of and for the items described in Attachments A and B for evidence, contraband, and/or instrumentalities of the criminal conduct described herein. Additionally, unless otherwise indicated, wherever in this Affidavit I assert that an individual made a statement, that statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, unless

otherwise indicated, all statements contained in this Affidavit are summaries in substance and in part.

5. I am investigating the criminal activities of Zalan Dulin ("Dulin"). Based upon the information obtained in the investigation and as set forth below, I submit that probable cause supports that Dulin used a minor to engage in sexually explicit conduct for the purpose of creating a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a); possessed child pornography in violation of 18 U.S.C. § 2252(a)(4)(B); and that evidence of these crimes exists on the one electronic device that is the subject of this affidavit.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

6. The property to be searched is an Apple iPhone 14 Plus; yellow in color; phone number: 502-780-9376; serial number: K4YYYGPRWG; IMEI number: 358257933196499, currently located at Lexington Police Department, 150 East Main Street, Lexington, KY 40507

7. The phone is referred to herein as the "Device."

8. The Device is in law enforcement custody at Lexington Police Department in Lexington, Kentucky. The Device was manufactured outside of Kentucky.

9. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

**STATUTORY AUTHORITY**

10. This investigation concerns alleged violations of Title 18, United States Code, §§ 2251(a) and 2252(a)(4)(B), relating to material involving the sexual exploitation of minors:

a. 18 U.S.C. § 2251(a) prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor to engage in, or to have a minor assist any other person to engage in, or to transport any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with

the intent that such minor engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct.

b. 18 U.S.C. § 2252(a)(4)(B) prohibits a person from knowingly possessing or accessing with intent to view any visual depiction using any means or facility of interstate or foreign commerce or that has been mailed, or that has been shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproduces any visual depiction for distribution using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails, if (i) the producing of such visual depiction involves the use of a minor engaged in sexually explicit conduct; and (ii) such visual depiction is of such conduct.

c. 18 U.S.C. § 2422(b) prohibits a person from using the mail or a means or facility of interstate commerce to knowingly persuade, induce, entice, or coerce a minor to engage in any sexual activity for which any person can be charged with a criminal offense.

**DEFINITIONS**

11. The following definitions apply to this Affidavit and its Attachments:

a. The term "minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years. At times, this affidavit and its attachments may also refer to a minor or minors as "child" or "children," respectively.

b. The term "sexually explicit conduct," 18 U.S.C. § 2256(2)(A)(i-v), is defined as actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic areas of any person.

c. The term "visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

d. The term "computer," as defined in 18 U.S.C. §1030(e)(1), means an electronic, magnetic, optical, electrochemical, or other high speed data processing device

performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

e. "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.

f. "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h. "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

i. "Computer passwords, pass-phrases and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or passphrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

j. "Digital camera" can be a standalone camera or be embedded into a smartphone. This device records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

k. "GPS" is a navigation device that uses the Global Positioning System (generally abbreviated "GPS") to display its current location. A GPS can either be a standalone device or it can be embedded into a smartphone. It often contains records of the locations where it has been. Some GPS navigation devices can give a user directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

l. The term "child pornography," as defined in 18 U.S.C. § 2256(8), means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. This is also referred to as child sexual abuse material.

m. "Child sexual abuse material," as used herein, refers to child pornography, as defined by 18 U.S.C. § 2256(8). The FBI refers to child pornography as "child sexual abuse material" or "child exploitation material" because these terms most accurately reflect the sexual abuse and exploitation experienced by child victims.

n.   The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means. Because this search warrant application relates to a smartphone, such records, documents, and materials should primarily refer to electronic information or data on the Devices or any associated storage mediums.

o.   The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

p.   "Internet Service Providers" (ISPs), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

q.   "Internet Protocol address" (IP address), as used herein, is a code made up of numbers separated by dots that identifies a particular computer on the Internet. Every computer requires an IP address to connect to the Internet.  IP addresses can be dynamic, meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are listed in one of two formats: "IPv4", which is the older version of IP addresses, and IPv6, which is the newer version of IP addresses.

r.   "Domain names" are common, easy to remember names associated with an IP address.   For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.

s.   "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

t.   The term "Social Networking Site" is used to describe applications or websites which focus on establishing networks or relationships among individual users based on interests or activities. Such sites include social media applications or websites, instant messaging applications or websites, dating applications or

websites, online forums or message boards, and chat rooms. Social Networking Sites operate via the internet. These sites are also referred to as "social media."

u. "Smartphone" means a combination of a mobile phone / cellphone and a handheld computer that works off mobile networks and/or Wi-Fi, or a wireless connection. A smartphone can do everything a personal computer can do, and because of its mobility, sometimes more. A smartphone is a mobile phone with highly advanced features. A typical smartphone has a high-resolution touch screen display, Wi-Fi connectivity, Web browsing capabilities, and the ability to accept sophisticated applications. Most of these devices run on two popular mobile operating systems, Android or iOS. Almost all smartphones now run on processors with high processing speeds coupled with low power consumptions. That means they allow you to play games, browse the Web, update your social media accounts (i.e., Facebook, Instagram, Twitter), make phone calls, send/receive text messages, take pictures, make videos, and even compose word documents directly on the device. A smartphone is always generally with reach. Like with a traditional computer, smartphones have the ability to download and run hundreds of thousands of mobile applications.

v. "Tablet" means a mobile computer, typically larger than a phone yet smaller than a notebook, which is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending, and receiving e-mail, and participating in Internet social networks.

w. "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading

information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

x. "Mobile device" refers to a piece of portable electronic equipment that can connect to the internet and/or store data. Common examples include wireless telephones, smartphones, tablets, laptops, and portable media players.

y. "Electronic storage medium," as used herein, refers to any item capable of electronic storage, including but not limited to computers, computer hardware, digital cameras, mobile devices, CDs, DVDs, SD cards, memory sticks, etc.

**CHARACTERISTICS COMMON TO INDIVIDUALS WHO PRODUCE OR RECEIVE CSAM**

12. Based on my previous investigative experience related to child sexual abuse material investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who produce and receive child pornography or use the internet or Social Networking Sites to entice or coerce minors to provide child sexual abuse material:

a. Individuals who receive or produce child sexual abuse material may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. Individuals who receive or produce child sexual abuse material may collect sexually explicit or suggestive materials, in a variety of media, including photographs, digital images and videos, magazines, motion pictures, books, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts or to refresh their memories of prior sexual child abuse activities they have committed.

c. Individuals who receive or produce child sexual abuse material almost always possess and maintain their original copies of child pornographic material, that is, their pictures and videos in the privacy and security of their home, person, vehicle,

workplace, or some other secure, web-based or cloud-based, location.  Individuals who have a sexual interest in children or images of children typically retain pictures, videos, films, photographs, magazines, correspondence, books, mailing lists, and child erotica for many years. Many of these collections can be found on external media storage devices that are easily concealed in the home, a vehicle, or the workplace, away from family members or co-workers who could stumble upon the collection.  The collections may also be concealed on smartphones in hidden applications or albums, or concealed on external storage devices.

      d.     Likewise, individuals who receive or produce child sexual abuse material often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer, web-based program, cloud-based program, or secure third-party application on a mobile device or computer. These collections are often maintained for several years and are kept close by. Physically they can be kept at the collector's residence, a storage building(s) or inside the collector's vehicle, to enable the individual to view the collection, which is valued highly. Digitally they are kept on the device(s) the individual has on their person the most, or a device only they know the password to.  Many traders and collectors of child sexual abuse material will ensure their collection, or at least part of their collection, is in a location they have frequent or easy access to and maintain "eyes on" the collection at all times.  In your affiant's training and experience, collectors of child sexual abuse material will either have a location in their residence, in their personal vehicles, or at work, where they maintain their non-cloud-based collection.

      e.     Individuals who receive or produce child sexual abuse material also may correspond with and/or meet others to share or trade information and materials. They rarely destroy correspondence from other child sexual abuse material distributors/collectors. They conceal such correspondence as they do their sexually explicit material. They often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child sexual abuse material. Sometimes these lists are kept physically, but in more and more cases, the lists are maintained on a mobile or electronic device, or within an application or web-based program (like a friends list on a social media application).

      f.     Individuals who receive or produce child sexual abuse material also can, and will, maintain a separate mobile device for their collection, storage, and correspondence regarding child sexual abuse material.  These devices are usually kept hidden from family members, partners, and co-workers, in locations either only the collector has access to, or location others have limited access to (for example, an outbuilding, workshop, file cabinet drawer, vehicle if each member of the family has their own, or locked safe).  These locations can also be storage locations for any external devices (mentioned above) that may contain a collection.

      g.     Individuals who receive or produce child sexual abuse material prefer not to be without their child sexual abuse material for any prolonged time period.  This

behavior has been documented by law enforcement officers involved in the investigation of child sexual abuse material throughout the world.

h. Individuals who produce child pornography via the internet or in-person often engage in "grooming" with the minor child. Grooming "describe[s] a variety of behaviors that appear calculated to prepare a child for a future sexual relationship." *United States v. Fox*, 600 Fed. Appx. 414, 419 (6th Cir. 2015) (unpublished) (citations omitted). "The ultimate goal of grooming is the formation of an emotional connection with the child and the reduction of the child's inhibitions in order to prepare the child for sexual activity." *See Id.* Based on my training and experience, grooming often includes first forming a friendship with the child; showering the child with attention, compliments, pet names, and gifts; exchanging non-explicit pictures or videos; and then flirting, discussing sexual knowledge or experience, discussing sexual fantasies, exchanging sexually explicit pictures or videos, and planning in-person sexual activities. Computers and smartphones often contain evidence of grooming, because many of these conversations occur by text or instant messaging.

i. In my experience, many offenders who produce child pornography also use coercive tactics to achieve their end goals of creating or obtaining sexually-explicit content. These coercive tactics include manipulation, threats to the minor, and threats to the minor's parents. Again, computers and smartphones often contain evidence of these coercive tactics.

13. I believe that Dulin shares many of these characteristics because—as discussed in greater detail below—Dulin recently produced at least one sexually explicit video of a minor ("Victim 1") and stored that video on his cellular device. Law enforcement also discovered that Dulin continues to converse with Victim 1 about past and future sexual interactions while being in the custody of the Fayette County Detention Center on unrelated charges. In those jail messages, Dulin also asks Victim 1 to engage in sexually explicit conduct via picture and video. Dulin also had two prior contacts with law enforcement for child sexual abuse material. The first instance occurred in 2017—when Dulin was in middle school. A like-aged minor female sent Dulin a video of herself masturbating, which Dulin spread around the school after becoming upset with the minor female. The second instance occurred in 2019—when Dulin was in high school. According to law enforcement reports, a minor female exposed herself on a Facetime call

with Dulin, and Dulin recorded the Facetime call without the minor female's permission. Although Dulin denied sharing the videos, reports indicate that the videos were distributed to others and Dulin was the source of the videos. Although Dulin was a minor during the 2017 and 2019 occurrences, these events indicate an interest in collecting and sharing amateur or homemade pornography. Dulin's jail messages with Victim 1 demonstrate Dulin's continued interest in amateur sexually explicit images of minors, despite Dulin no longer being a minor himself.

**BACKGROUND ON COMPUTERS AND CHILD SEXUAL ABUSE MATERIAL**

14. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

15. Computers and digital technology have dramatically changed the way in which individuals interested in child sexual abuse material interact with each other. Computers basically serve four functions in connection with child sexual abuse material: production, communication, distribution, and storage.

16. In the past, technology for the transfer of child sexual abuse material images consisted of child pornographers' transferring printed photographs into a computer-readable format with a device known as a scanner. Now, with the advent of digital cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. In the last ten years, the resolution of pictures taken by digital cameras has increased dramatically, meaning the photos taken with digital cameras have become sharper and crisper. Photos taken on a digital camera are either stored on a removable memory card in the camera, which store up to, or even over, 64 gigabytes of data, equivalent to hundreds of thousands of high-resolution photographs, or the camera is Bluetooth

or Wi-Fi capable so the images can be transferred directly to another device, or directly into a social media account on the internet. Video camcorders, which once recorded video onto tapes or mini-CDs, are now just video cameras that can save video footage in a digital format directly to a hard drive embedded in the camera, or onto a transferable media storage device like a SD card. Some video cameras now even have Bluetooth or Wi-Fi capabilities so they can transfer the image directly to another device, or directly into a social media account on the internet. For the old camcorders, the video files can be easily transferred from the camcorder to a computer via a cable that comes with the camcorder. Now, all smartphones come with a digital camera embedded into the device itself. The resolution on some of the embedded cameras on smartphones can be of a higher resolution than portable digital cameras. The digital camera embedded in a smartphone can save the image directly onto the device, into a specific folder on the device, to a third-party application installed on the smartphone, to a media storage card inserted into the smartphone, or the image can be directed to transmit to an external device via wireless or Bluetooth connectivity between the smartphone and the selected external device.

17. A device known as a modem allows any computer to connect to another computer through a telephone, cable, or wireless connection (Wi-Fi). Similarly, smartphones can connect to the internet via Wi-Fi or cellular data. Thus, electronic contact can be made to literally millions of computers around the world. The ability to produce child sexual abuse material easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child sexual abuse material. Child sexual abuse material can be transferred via electronic mail, through file transfer protocols (FTPs), through Peer-to Peer software, and through social media applications, to anyone with access to a computer, laptop, tablet, smartphone, and a modem. Because of the

proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging", "Direct Messaging", cloud-based messaging services, etc.), social media sites, free applications for smartphones and tablets, all with easy access to the Internet, the computer, laptop, tablet, and smartphone is a preferred method of production, distribution, and receipt of child sexual abuse materials.

18. The computer's, laptop's, tablet's, and smartphone's ability to store images in digital form makes these devices themselves an ideal repository for child sexual abuse material. The size of the electronic storage media (commonly referred to as the hard drive) used in all forms of electronics has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One, two, and even four-Terabyte external and internal hard drives are not uncommon in today's computers and laptops. Other media storage devices include CDs, DVDs, "thumb," "jump," or "flash" drives, and external hard drives, which are very small devices that are plugged into a port on the computer, smartphone, laptop, or tablet. It is extremely easy for an individual to take a photo with a digital camera, upload that photo to a computer, smartphone, laptop, and tablet, and then copy it (or any other files on the device) to any one of those media storage devices. Media storage devices are constantly being made smaller and smaller in size, and also being made to look like everyday items, that they can easily be concealed and carried on an individual's person (like on a key ring, in a purse or wallet, or on a belt buckle).

19. The Internet affords individuals several different venues for obtaining, viewing, and trading child sexual abuse material in a relatively secure and anonymous fashion, including the traditional "Web" and the "Dark Web" or Tor browsers.

20. Individuals also use online resources to retrieve and store child sexual abuse material, including services offered by Internet Portals such as Yahoo!, Google, and Hotmail, among others, as well as third-party cloud-based storage applications like Dropbox and Vault. The online services allow a user to set up an account with a remote computing service that provides e-mail services, direct messaging, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child sexual abuse material can be found on the user's computer, smartphone, laptop, tablet, or external media in most cases. All smartphones now come with the option to have the phone's data systematically updated to a provider's cloud storage. All iPhones can back up a phone's data to iCloud Storage and all Android phones can back up the phone's data to Google Cloud Storage. This automatic backup also can back up some third-party applications. But most third-party applications, once installed on a mobile device, will keep the individual's contents on one of their own servers, located elsewhere. Some third-party applications allow for special storage on the user's device through their application. While the third-party application can see there is data, the data is encrypted on the application's servers and can only be viewed on the user's device through a special portal or passcode.

21. As is the case with most digital technology, communications by way of electronic device can be saved or stored on the device used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to

electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

**PROBABLE CAUSE**

22. On February 28, 2024, detectives with the Lexington Police Department ("LPD") were conducting surveillance at the residence identified as 904 Royal Avenue Lexington, KY.

23. LPD detectives observed three black males exit on a sidewalk between 904 Royal Avenue #A and 904 Royal Ave. #B on to La Flame Alley. One of the subjects was wearing a gray jump suit, one was dressed in all black, and the third had on a dark hooded sweatshirt. LPD detectives noticed all three males had the hoods pulled up.

24. Detectives lost sight of the three subjects as they walked from La Flame Alley towards 7th Street. Shortly after losing sight of the three subjects, detectives heard multiple gunshots and saw multiple muzzle flashes coming from the immediate area where the three subjects were last observed.

25. After hearing the barrage of gunfire, detectives observed all three subjects run on La Flame Alley and back into 904 Royal Avenue #A. Detectives observed one of the subjects wearing all gray and carrying an AK-style firearm (a type of assault rifle that typically carries a 30-round magazine).

26. Detectives were then notified by LPD Detective Music that he had just been shot by the subjects that exited 904 Royal Avenue #A. LPD patrol units established a perimeter around the residence and notified their Emergency Response Unit ("ERU").

27.     ERU arrived on scene and gave the occupants of 904 Royal Avenue #A verbal commands to exit the residence. The three male subjects exited the residences and were identified and arrested.

28.     One of the male subjects was identified as Zalan Dulin ("Dulin") who is an adult male.

29.     LPD executed a residential search warrant at 904 Royal Avenue #A and seized, among other things, a yellow Apple iPhone with a gray and white protective case (also referred to herein as the "Device").

30.     None of the identified subjects removed from the residence claimed ownership of the yellow Apple iPhone.

31.     LPD executed a search warrant to search and seize the contents of the cell phone for evidence related to the shooting of Detective Music.

32.     Upon review of the contents of the cell phone, detectives identified the phone as belonging to Dulin. LPD searched several types of data on the device for evidence relating to the shooting, including communications and media (pictures and videos). Notably, the Device contained photos of Dulin and another gang member posing with firearms that LPD believes were used in the shooting of Detective Music.

33.     Almost immediately upon searching the Device's media, detectives located several sexually explicit videos depicting Dulin engaged in vaginal intercourse with an unidentified female. In the video, the faces of both subjects can be seen. Although the unidentified female was pubescent, she appeared to be young.

34.     Detectives later identified the female in the video ("Victim 1," born in July 2008) by observing jail phone calls and text messages—including pictures—between Victim 1 and

Dulin (these monitored communications from Fayette County Detention Center's system are hereafter referred to as "jail communications" or jail messages"). Detectives quickly gleaned from the jail communications the romantic nature of the relationship between Dulin and Victim 1.

35. After observing the contact information associated with Victim 1's jail communications and a photo of her on the jail system, law enforcement identified Victim 1 as a minor.

36. The jail communications between Dulin and Victim 1 indicate that, prior to Dulin's detention, Dulin and the Victim communicated by cell phone. In one message, Victim 1 tells Dulin that she has not been using her phone as much since he has been detained:[1]

purpose and i can show you when you get out i just don't be on my phone like i use to cuz your not here yk so i really just

37. These jail communications between Victim 1 and Dulin described previous sexual interactions between the two as well as their desire for future sexual interactions.

38. There are several messages from Dulin that are sexual in nature. For example:

im soo glad i seem youuu u looked so good!!! u made me wanna eat you u soooo good from back but wait til whem i gey out i miss you and wyd now baby girl daddy loves youuu

39. In the message below, Dulin references "pictures" of Victim 1 in a sexual context—whilst apparently making plans for sex with Victim 1 when he gets out of custody:

---

[1] I have reviewed the entirety of the messages but only included the relevant portions herein. For ease of reading, I have also added highlights to some messages (where there are run-on sentences or other issues that make the messages difficult to read).

40.    There are at least two messages in which Dulin asks Victim 1 to engage in sexually explicit conduct via camera. In the following message, Dulin asks Victim 1 for a picture in underwear and, though her genitals would be covered in the requested picture, Dulin asks her to place her finger on her genitals:[2]

41.    In the message below, he asks the minor to masturbate with her video camera on but "out of camera" while he can still hear her:[3]

---

[2] This conduct may qualify as actual or simulated masturbation or a lascivious exhibition of the public area.

[3] Dulin specifically asks the minor to engage in sexually explicit conduct (masturbation) for the purpose of creating a video (a visual depiction) for him.

19

42. The jail communications further indicate that Victim 1 sent several media files to Dulin that were screened as "sexually explicit" and therefore were not delivered.[4]

43. LPD referred the matter of Victim 1's sexually explicit videos to FBI for investigation.

44. FBI reported Victim 1's continued interaction with Dulin to Child Protective Services ("CPS"). Victim 1 reported that that she met Dulin approximately a year ago through school. I believe Victim 1's estimation is incorrect because publicly available social media posts indicate that Dulin graduated in 2022.

45. Victim 1 further advised CPS that she started dating Dulin in approximately October 2023. Victim 1's parents claimed that, until Dulin's involvement in the shooting of Detective Music, they were unaware Dulin was an adult.

46. During CPS's visit to Victim 1's home on April 8, 2024, and while CPS spoke to Victim 1's mother, Dulin called Victim 1. Victim 1 answered the phone and whispered throughout the conversation (presumably so CPS and her mother would not hear her). During the call, Victim 1 told Dulin the "CPS worker is here for me sending messages." Victim 1 added that Dulin was under investigation because "they" knew about the messages. Victim 1 further advised Dulin that "they" wanted her parents to take her phone away. At that point, Dulin said "delete the videos then, delete everything."

47. Because I have not viewed the child pornography materials on the Device (waiting to obtain a warrant to do so), I am not aware of the dates associated with the sexually explicit videos of Victim that LPD observed while searching Dulin's phone (though they were

[4] I have not observed the screened media. I am in the process of ascertaining whether the media exists on the jail system's servers.

probably in the recent camera roll). Accordingly, some of the date ranges in Attachment B are based on Dulin's eighteenth birthday (June 5, 2022).[5]

48. *Summary of Probable Cause.* There is a fair probability that evidence of production and possession of child pornography and online enticement will be located on the Device because: (1) Dulin requested sexually explicit content from a minor on a monitored jail system; (2) the minor referenced communicating with Dulin by phone before his arrest; (3) the Device belongs to Dulin; and (4) LPD saw in plain view sexually explicit videos of Victim 1 while searching the Device for evidence relating to the shooting of Detective Music.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

49. As described above and in Attachment B, this application seeks permission to search for records that might be found on the Devices, in whatever form they are found. One form in which the records might be found is data stored on a smartphone's storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

50. *Probable cause.* I submit there is reason to believe the records listed in Attachment B will be stored on the Devices for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer/smartphone[6] files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little

[5] Although it is possible for a minor to violate 18 U.S.C. § 2251(a)(1), 18 U.S.C. § 2252(a)(2), and 18 U.S.C. § 2422(b), based on the facts and circumstances presented here, FBI is not interested in charging Dulin for any violations that occurred before his eighteenth birthday.

[6] Because a smartphone is, in part, a handheld computer, this portion of the affidavit will use the terms "computer" and "smartphone" interchangeably.

or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer or smartphone's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet / cellular connection are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronic files or data that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the Devices because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified for nefarious reasons by a subject.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when,

where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

      c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

52. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

53. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

54. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## REQUEST FOR SEALING

55. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court (beyond the default seal period of two weeks). These documents discuss an ongoing criminal investigation that is neither public nor known to the target of the investigation. Because Dulin and Victim maintain regular contact, if the investigation becomes known to Dulin or Victim 1, Victim 1 may

feel compelled to flee or obstruct justice (either at the direction of Dulin or on her own accord). Moreover, Dulin and his associates involved in the shooting of Detective Music are believed to be part of a violent street gang whose other members may intimidate Victim 1 or other witnesses. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Christopher D. Faas
Christopher D. Faas, Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me on this 25 day of April, 2024,

Hon. Matthew A. Stinnett
UNITED STATES MAGISTRATE JUDGE